1  UNITED STATES DISTRICT COURT
2  SOUTHERN DISTRICT OF NEW YORK
3  --------------------------------------------------------x
4  CHITRA KARUNAKARAN,                                    Case No.: 18-CV-10723

5                               *Plaintiff*,              **SECOND AMENDED COMPLAINT**

6         -against-                                       **JURY DEMAND**

7  BOROUGH OF MANHATTAN COMMUNITY
8  COLLEGE, CITY UNIVERSITY OF NEW YORK,
9  ANTONIO PEREZ, KARIN WILKS, SANGEETA
10 BISHOP, RIFAT SALAM, ANTIONETTE McKAIN,
11 ROBERT DIAZ, IAN WENTWORTH, MICHAEL
12 HUTMAKER, MARVA CRAIG,

13                               *Defendants*.
14 --------------------------------------------------------x

15       Faculty Plaintiff, Dr. Chitra Karunakaran, Ed.D. ("Plaintiff"), appearing Pro se,

16 respectfully requests ALL Defendants, named above, to first acknowledge and then

17 work collectively and with integrity to redress the academic and behavioral  harm

18 done to one [1]  freshman student (hereinafter "Student") through an intentionally

19 structured  morass of racially charged, discriminatory, bureaucratic entanglements

20 and mis-perceived 'turf' privileges across offices, departments and personnel, that

21 <u>causally</u> produced an entirely undesirable, racially charged discriminatory outcome

22 for both Plaintiff and Student, in 16 weeks of a Spring semester,  2018.

23                              **INTRODUCTION**

24       1.    This action seeks to assert the rights and corresponding

25             professional obligations of Plaintiff, a Psychology and  Sociology

Professor at BMCC, who was subject to hostile and discriminatory workplace conditions and interactions and became the subject of discriminatory retaliation.

2.     This renewed action focuses upon and releases, mainly contemporaneously recorded data evidence, by Plaintiff of events in her class and office  in Spring 2018, as well as extensive data contained in email communication with Defendants' on acts of unlawful discrimination and retaliation, based on Plaintiff's race, national origin, and age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000 et seq., The Age Discrimination in Employment Act ("ADEA") 29 U.S.C. § 621 et seq., The Executive Law of the State of New York, New York State Human Rights Law ("Executive Law"), § 296 et seq., the Administrative Code of the City of New York, New York City Human Rights Law ("Administrative Code") § 8-101 et seq.

## PROCEEDINGS TO DATE

3.     Plaintiff filed a charge of discrimination with the New York State Division of Human Rights, August 13, 2018.

4.     The charge reached EEOC, issued a Right to Sue letter to Plaintiff, August 21, 2018

5.     Plaintiff filed a Pro Se complaint in this Court, November 15, 2018.

6.     Plaintiff was previously represented by an attorney

46      7.     Defendants' Motion to Dismiss was granted February 12, 2021

47      8.     Plaintiff was given leave to amend her Complaint, she requested and was granted

48     an extension,

49              until May 3, 2021.

50      9.     Plaintiff filed a Notice of Pro se Appearance April 22, transaction was entered April

51     23, 2021

52              **JURISDICTION AND VENUE**

53      10.    This Court has jurisdiction over Plaintiff's federal claim pursuant to 28 U.S.C. §

54     1331 and 42 U.S.C. §§ 2005(f)(1),5(f)(3), and supplemental jurisdiction over the State and City

55     law claims pursuant to 28 U.S.C. § 1367.

56      11.    As the Southern District is the district where a substantial part of the events giving

57     rise to the claims occurred, venue is proper with this district pursuant to 28 U.S.C. § 1391(a)(2).

58                 **PARTIES**

59      12.    Plaintiff is a "person" within the meaning of Executive Law § 292(1), and within

60     the meaning of    New York City Administrative Code § 8-102(1).

61      13.    Plaintiff is a 75-year immigrant female of Indian national origin within the Federal

62     definition AAPI

63      14.    Defendant, Borough of Manhattan Community College is a division of City

64     University of New York and is a community college in New York City located at 199 Chambers

65     Street New York, New York 10007.

66      15.    Plaintiff had been employed as a Psychology and Sociology Professor with BMCC

67     for approximately 20 years until May 11, 2018.

68      16.    Defendant Wilks is employed as the current Interim President of BMCC.

17.     Upon information and belief, during all relevant times herein, Defendant Wilks was a decision-maker as to matters of faculty hiring, retention and termination.

18.     Defendant Perez was employed by BMCC as the previous President of BMCC.

19.     Upon information and belief, during all relevant times herein, Defendant Perez was a decision-maker as to matters of faculty hiring, retention and termination.

20.     Defendant Bishop is employed as the Chair of the Social Sciences Department, BMCC

21.     Upon information and belief, during all relevant times herein, Defendant Bishop was a

        decision-maker in matters of faculty hiring, retention and termination.

22.     Defendant Salam is employed as the Deputy Chair, supervises Adjunct Faculty, BMCC

23.     Upon information and belief, during all relevant times herein, Defendant Salam

        was a decision- maker in matters of faculty hiring, retention and termination.

24.     Defendant McKain is employed as the Director of Evening/Weekend and Off-Site

        Programs at BMCC.

25.     Upon information and belief, during all relevant times herein, Defendant McKain was a

        decision-maker as to matters of faculty hiring, retention and termination.

26.     Defendant Diaz is Vice President of Legal Affairs, conducts Grievances,

        heads Office of Human Resources, BMCC

27.     Upon information and belief, during all relevant times herein, Defendant Diaz was

        a decision-maker as to matters of faculty hiring, retention and termination.

4

94  28  Defendant Wentworth is employed in the Office of Student Affairs as Student Life

95  Manager for Student Conduct and Academic Integrity, BMCC to deliver behavioral

96  and academic integrity services to students through BART Behavioral Assessment

97  Response Team, established in 2012 under BMCC President Antonio Perez,

98  Defendant

99  29.  Upon information and belief, during all relevant times herein, Defendant

100  Wentworth was a decision-maker in matters of "Student Conduct and Academic

101  Integrity", BMCC.

102  30.  Defendant Hutmaker is employed as the Dean of Student Affairs, BMCC.

103  31.  Upon information and belief, during all relevant times herein, Defendant Hutmaker

104  was a

105  decision-maker in student matters.

106  32. Defendant Craig is employed as the Vice President of Student Affairs at BMCC.

107  Defendant Craig was highly accessible to students and faculty before BART, under

108  President Perez, implemented a distancing mechanism that thwarted and impaired

109  student academic success efforts of faculty

110  33.  Upon information and belief, during all relevant times herein, Defendant Craig was a

111  decision-maker as to student matters.

112  34. Plaintiff's Note: On May 16, **2008 before** BART was implemented **2012**, under

113  Defendant Perez, Dean Craig was most accessible to this Plaintiff, in the matter of an

114  older male Puerto Rican studentJ He was walking extremely unsteadily and singing

115  loudly inside the A train station. I recognized him.  I said, "Hi J…." he smiled then his

116    face became serious, and he said ""You will pay. You (will) lose your job. I know

117    important people."

118    Plaintiff left the station, returned to BMCC Chambers Street and went straight to

119    Student Affairs. That student was justified to feel concerned, in Plaintiff's view,

120    because he had twice failed the course, previously with another professor and then with

121    Plaintiff, however his conduct, off-campus and inside a public access facility, was

122    inappropriate, potentially inimical to my personal safety and needed immediate

123    attention. Dean Craig resolved the matter that very same evening inside the Office of

124    Student Affairs face to face with Plaintiff. Dean Craig called Dean called "Student J"

125    by telephone, in my and Officer MacLarty's presence. Dean Craig advised

126    StudentJ" **not** to come to class on Monday May 19, 2008 and instead to contact

127    you, Social Sciences Chair Emily Anderson, Dean Craig swiftly addressed the

128    situation while at the same time, supporting this student's concerns, that Plaintiff shared

129    with her. (excerpted from contemporaneous email message to then Social Sciences

130    Chair Emily Anderson 5/18/2008)

131    **JURY DEMAND**

132    35. Pro se Plaintiff herein demands a trial by jury in this action.

133

134    36. As Pro se Plaintiff proceeds through the various steps to the jury phase, Plaintiff

135    respectfully indicates, for future consideration by this Court, my anticipated Motion to

136    Compel Discovery of exactly how and why the BART mechanism was deployed to

137    accomplish a two-fold discriminatory outcome that:

138   [1] prevented, hindered, impeded, obstructed Plaintiff from aiding "Student" facing

139   observable conduct challenges, that were unmediated by BMCC Defendant in change

140   of Student Conduct.

141    [2] subjected Faculty Plaintiff to racially discriminatory treatment in the course of her

142   professional, contractually secured professional responsibilities to "Student" and ALL

143   students.

144          **FACTS**

145  37. Plaintiff was employed with BMCC for approximately 20 years as a psychology and

146   sociology professor and had always been successfully able to handle her duties and

147   responsibilities including, but not limited to, advising and mentoring students and

148   teaching her.  In 20 years of continuous teaching not ONE student has ever complained

149   about her grade, said Plaintiff was ever late for class or had ever disrespected her.  In

150   fact, EVERY Student evaluation of my 20-years' faculty performance contains NO

151   instance of bias or disrespect towards ANY student. This was equally true in Spring

152   2018.  "Student" was the sole, singular instance of a highly deserving Student who fell

153   victim to the BART system and missed succeeding in passing her required course, due

154   to her unmediated conduct issues, by BART under Defendant Wentworth.

155  38. Faculty Plaintiff respectfully wishes the Judge to note her <u>last</u> Teaching evaluation

156   conducted and completed by Dr Yana Durmysheva described Plaintiff's   teaching as

157   **"superb."** This vital faculty teaching record, to carry the proper weight and

158   substance in this court, in light of unlawful racialized discrimination in employment

159    and retaliation against protected activity, may please be ordered to be released <u>directly</u>

160    by the Chair of Social Sciences, Defendant Bishop, to the attention of this court.

161    39. On May 11, 2018, Defendant Perez denied Plaintiff's re-appointment for the upcoming,

162    fall 2018, semester, even while his own handpicked CDO Chief Diversity Officer was

163    engaged in investigating my Complaint and directly communicating with me and

164    setting up dates for interviewing me. Due process was denied.

165    40. This denial of was the result of discrimination and retaliation based upon Plaintiff's

166    race, ethnicity national origin, gender and age plus Plaintiff's persistent participation

167    in lawful union activity, during high profile academic years 2017-2018 of the Middle

168    States' accreditation. Plaintiff's whistleblower queries addressed to Defendants

169    Provost Wilks and President Antonio Perez and several others, apparently drew the ire

170    of these same high-level functionaries whom Plaintiff has named as Defendants.

171    41. February 27, 2018 a student in Plaintiff's class initiated a series of verbally and

172    physically aggressive towards Plaintiff disrupted class activities, failed to commence

173    and complete essential assignments.  Defendant Wentworth failed to help the Student

174    manage her in-class conduct. Student stopped attending classes 3/27 but stayed online

175    and did no work after 3/27. Staying enrolled and online afforded "Student" the

176    opportunity to submit a faculty evaluation.

177    42. Upon information and belief, the behavior by this student was racially motivated as

178    Plaintiff had taught 4 online classes to this student without any disruption. However,

179    upon information and belief, once this student was present in an "in-person" class, the

180    serial disruptive and aggressive behavior began and continued until she voluntarily

181    stopped attending 3/27, after failing her Midterm.

182    2/27 "Student" to Plaintiff "You suck. You don't know anything." This mocking

183    derogatory demeaning comment was again repeated to my face in classes 2 more times.  Student's

184    serial departures from appropriate conduct intentionally accepted and unmediated by Defendant

185    Wentworth, prevents her from succeeding in her course. Defendant Wentworth was never held

186    accountable for failing to intervene on behalf of "Student". Plaintiff made 2 suggestions in follow

187    up emails to Defendants. [1] Plaintiff expressed a preference to speak with Student "if she would

188    agree,[2] Plaintiff strongly recommended, during VoE Verification of Enrollment, that "Student'

189    be offered and recommended to take a 100% online class as she was attending infrequently and

190    would not need to interact in in-class sessions with an Instructor.  Neither suggestions were even

191    considered by indication of any reply to my 2 suggestions.

192    43. Plaintiff made numerous complaints to management, including the Defendants,

193        regarding this student and requested that the OSA remove her from my class. BART's

194        Wentworth , as a matter of intentional policy ignored the Plaintiff's reports,  took no action

195        to remedy the situation and not only allowed, but actively supported  the conduct to

196        repeatedly re-occur. His negatively supportive action was to "close the "case" '"quickly".

197    44. 3/22 Dean Erwin Wong, head of Academic Affairs blows open Defendant Wentworth's

198        "closed" "quickly" "case" He sends a strongly worded message to all defendants and

199        especially Defendant Wentworth, naming him and explicitly tasking him thus:

200        "The disruptive behavior being described warrants intervention by Mr. Ian Wentworth

201        in Student Affairs, who handles student behavior issues. By way of cc, I am alerting

202        him, and he will act accordingly."

203    "Student" apparently was emboldened by Wentworth's incompetence, matched only by

204    his overconfidence in his own lack of professional judgment, failing as he repeatedly did,  to  assist

205   her, **behaviorally**, (Hey the B in BART is for Behavior) unable to assist her to manage her conduct

206   to the extent that she could succeed in passing her required course. The conduct events continue

207   "See detailed Calendar of Discrimination Retaliation Contract Breach"

208       45. On or about March 27, 2018, the student tried to physically grab papers and other

209           materials away from Plaintiff, exiting Plaintiff's office rapidly, therefrom, upon

210           learning her midterm score.

211       46. Plaintiff continued to complain about "Student"s conduct events to Defendants, but still

212           no action was taken to help the student manage her conduct so that she could succeed.

213           Plaintiff urged that she be offered the option to join a 100% online class wherein her

214           observable conduct could not be performed, by her, to her detriment, of her potential

215           for Student success and future career aspirations.

216       47. Specifically, Defendants Hutmaker, Craig, and Wentworth, not having membership in

217           Plaintiff's protected characteristics, might reasonably appear to any potential juror, that

218           each Defendant, separately and together,  by acts of omission or commission,

219           discriminated against Plaintiff based upon her race, national origin, and age by

220           completely disregarding their job responsibilities duties and at no point attempting to

221           remedy the ongoing and dangerous situation caused by "Student". From Plaintiff's

222           faculty standpoint, the union recommendation of calling Security to escort the student

223           out of class could be potentials damaging to the self-esteem of the Student, particularly

224           in the eyes of her peers and would not incentivize her to choose more appropriate

225           conduct options. "Plaintiff" never once in 20 years had elected to call Security on any

226           "Student."

227    48. "Student" s serially unmediated conduct culminating in Student's in-office attempted

228        grabbing of papers **3/27** causes Plaintiff emotional distress.  Plaintiff pre-announces

229        and takes two days of pre-announced emergency medical/personal safety leave, **3/29**

230        and **4/10** after not having taken any leave for 20 continuous years of faculty service to

231        BMCC.

232    49. On 3**/18**, 2018, Plaintiff filed a formal complaint with Defendant Perez focusing upon

233        the discriminatory, hostile work environment

234    50. Specifically, Plaintiff's Complaint letter to Defendant Perez 3/18 included complaints

235        regarding the "unchallenged racialized, ageist hostile work environment" that was

236        occurring as a result of Defendants' actions

237

238    51. Shortly after, on May 11, 2018, Plaintiff was retaliated against and was denied "re-

239        appointment" by Defendants, despite the fact that Plaintiff had been working at BMCC

240        without a service interruption for the past twenty (20) years.

241    52. Plaintiff participates vigorously and proactively in a union that endeavors to promote

242        equity parity and excellence in all matters of Faculty professionalism.  More instances

243        follow below, of Plaintiff's lawful protected activity

244    **FIRST CAUSE OF ACTION (Race and National Origin Discrimination – Federal**

245    **Claim Pursuant to Title VII Against Defendant BMCC and Defendant CUNY)**

246    53.    Plaintiff re-alleges and incorporates by reference herein paragraphs 1-53 as set forth

247    above.

248    54.    Defendants are employers as defined in Title VII, and at all relevant times herein

249    employed Plaintiff.

250    55.    In violation of 42 U.S.C. § 2000-e(2)(a), Defendants discriminated against Plaintiff

251 based on her race and national origin by terminating Plaintiff and treating her less favorably as

252 compared to similarly situated co-workers. Plaintiff's similarly situated co-workers were not

253 terminated.

254    56.    This discrimination was a result of intentional actions by Defendants and/or

255 deliberative indifference by Defendants to treat Plaintiff differently than similarly situated

256 employees that are not of Plaintiff's race and national origin.

257    57.    As a result of Defendants' discriminatory conduct, Plaintiff has incurred and will

258 continue to incur damages, including but not limited to lost income, emotional distress, and loss

259 of quality of life.

260    **SECOND CAUSE OF ACTION (Age Discrimination- Federal Claims Pursuant to the**
261    **ADEA**

262    58.    Plaintiff re-alleges and incorporates by reference herein paragraphs 1-57 as set forth

263 above.

264    59.    Defendants are employers as defined in 29 U.S.C. § 630 and at all relevant times

265 herein employed Plaintiff.

266    60.    In violation of the Age Discrimination in Employment Act Defendants discriminate

267 against Plaintiff based on her age by denying her re-appointment and treating her differently than

268 similarly situated employees. She was replaced by a younger Professor with less age-related years

269 of experience and salary and course preference related schedules and location.

270    61.    This discrimination was a result of intentional actions by Defendants and/or

271 deliberate indifference by Defendants to treat Plaintiff differently than similarly situated

272 employees that are not of Plaintiff's race and national origin.

273      62.    As a result of Defendants' discriminatory conduct, Plaintiff has incurred and will

274 continue to incur damages, including but not limited to lost income, emotional distress, and loss

275 of quality of life.

276 **THIRD CAUSE OF ACTION (Race, National Origin, and Age Discrimination – New York**
277 **State Claim Pursuant to the Executive Law Against all Defendants)**

278      63.    Plaintiff re-alleges and incorporates by reference herein paragraphs 1-62 as set forth

279 above.

280      64.    Defendants are employers as defined in Executive Law § 292(5) and at all relevant

281 times herein employed Plaintiff.

282      65.    Plaintiff is an employee within the meaning of Executive Law § 292(6).

283      66.    In violation of Executive Law § 296, Defendants discriminated against Plaintiff

284 based on her race, national origin, and age by denying her re-appointment and treating her

285 differently and less favorably than similarly situated employees.

286      67.    This discrimination was a result of intentional actions by Defendants and/or

287 deliberate indifference by Defendants to treat Plaintiff differently than similarly situated

288 employees that are not of Plaintiff's race and national origin.

289      68.    As a result of Defendants' discriminatory conduct, Plaintiff has incurred and will

290 continue to incur damages, including but not limited to lost income, emotional distress, and loss

291 of quality of life.

292 **FOURTH CAUSE OF ACTION (Race, National Origin, and Age Discrimination – New**
293 **York City Claim Pursuant to the Administrative Code Against All Defendants)**

294      69.    Plaintiff re-alleges and incorporates by reference herein paragraphs 1-68 as set forth

295 above.

70.     In violation of Administrative Code, § 8-101, Defendants discriminated against Plaintiff based on her race, national origin, and age by denying her "re-appointment" and treating her differently and less favorably than similarly situated employees.

71.     This discrimination was a result of intentional actions by Defendants and/or deliberate indifference by Defendants to treat Plaintiff differently than similarly situated employees that are not of Plaintiff's race and national origin.

72.     As a result of Defendants' discriminatory conduct, Plaintiff has incurred and will continue to incur damages, including but not limited to lost income, emotional distress, and loss of quality of life.

**FIFTH CAUSE OF ACTION (Retaliation- Federal Claims pursuant to Title VII, ADEA, against Defendant BMCC and Defendant CUNY)**

73.     Plaintiff re-alleges and incorporates by reference herein paragraphs 1-72 as set forth above.

74.     Plaintiff was subjected to retaliation in that she was denied re-appointment solely as a result of her participation in protected activity.

75.     As a result of Defendants' retaliatory conduct, Plaintiff has incurred and will continue to incur damages, including but not limited to lost income, emotional distress, and loss of quality of life.

**SIXTH CAUSE OF ACTION (Retaliation- New York State Claim under Executive Law against all Defendants)**

76.     Plaintiff re-alleges and incorporates by reference herein paragraphs 1-75 as set forth above.

77.     Plaintiff was subjected to retaliation in that she was denied re-appointment solely as a result of her participation in protected activity.

14

320    78.    As a result of Defendants' retaliatory conduct, Plaintiff has incurred and will

321 continue to incur damages, including but not limited to lost income, emotional distress, and loss

322 of quality of life.

323        **SEVENTH CAUSE OF ACTION (Retaliation- New York City Claim under**
324              **Administrative Code against all Defendants)**

325    79.    Plaintiff re-alleges and incorporates by reference herein paragraphs 1-78 as set forth

326 above.

327    80.    Plaintiff was subjected to retaliation in that she was denied re-appointment,

328            resulting from her participation in protected activity.

329    81.    As a result of Defendants' retaliatory conduct, Plaintiff has incurred and will

330 continue to incur damages, including but not limited to lost income, emotional distress, and loss

331 of quality of professional life at a Public university.

332                    **PRAYER FOR RELIEF**

333 **WHEREFORE**, Plaintiff prays that judgment be fairly entered against Defendants, jointly and severally,
334 to recover lost Salary, lost Social Security wages, lost Medicare wages, lost tax-deferred wages, at
335 respective face value, estimated at $95K for <u>each</u> of the following SEVEN Cause(s) of Action including
336 Statement of Honorable Severance from College Service, to be provided by The College
337
338        a.    On the First Cause of Action, judgment against Defendants

339        b.    On the Second Cause of Action, judgment against Defendants

340        c.    On the Third Cause of Action, judgment against Defendants

341        d.    On the Fourth Cause of Action, judgment against Defendants

342        e.    On the Fifth Cause of Action, judgment against Defendants

343        f.    On the Sixth Cause of Action, judgment against Defendants

344        g.    On the Seventh Cause of Action, judgment against Defendants

345    Respectfully submitted

346       Dr. Chitra Karunakaran Ed.D.

347       Pro se

348       ---------------------------------------------------------------------------------------------------

349       ------

350       **Contemporaneous data narratives added to Amended Complaint, as per Judge's**

351       **Leave to Amend**

352       Faculty Plaintiff Dr. Chitra Karunakaran Ed.D,  pleading pro se  brings her Second

353       Amended Complaint  for her continuing lawsuit against CUNY, an accredited, TITLE VI funded

354       MSI Minority Serving Institution for "non-reappointment, Plaintiff alleging with detailed factual

355       evidence,  [1] Racial Discrimination, [2] Age Discrimination,  [3] Retaliation  [4] Contractual

356       breach of an active and still ongoing multi-year adjunct faculty appointment through a collective

357       bargaining agreement secured by Plaintiff's union.

358       ---------------------------------------------------------------------------------------------------

359       Defendant Antonio Perez on 5/11/18 assigns no cause for my "non reappointment", even

360       after my 20 years' continuous service, not only because lacks grace and not only because he is

361       under no legal compulsion to assign cause, but because he has NO cause!  He could not assign a

362       lawful cause without provoking derisive laughter on [1] and [2] above, to perform a discriminatory

363       employment action. As President of an MSI, specifically an HSI, it is an egregious act that he used

364       his racially privileged position, to unlawfully target me due to my protected characteristics and

365       retaliated against me for my protected union activity (see below). MSI's though designated to meet

366       the needs of significantly represented demographic groups cannot lawfully cherry pick among

367       other underrepresented  demographic groups within an MSI to advance and achieve a

368       discriminatory employment  action.

369       Specifically, re: my union activity, Defendant Perez took unlawful retaliatory employment

370    action when he asked his designee Defendant Diaz (another comparator!) to reply me, rather than

371    reply himself, when I prevailed in my questioning and Defendant Karrin Wilks admitted not even

372    1 adjunct faculty (the majority faculty in numbers and in numbers of courses taught across C was

373    represented on his Equity and Inclusion **Task Force (11/2017]**

374       "Equity" without representation?

375       "Inclusion" without representation?

376       All faculty regardless of appointment, are comparators. The central fact of comparator

377    status is we teach the **same** students.  Any potential juror might reasonably conclude that excluding

378    some faculty, on the basis of their undeserved inequity, does **not** accomplish equity!  Task Forces

379    are not routine academic committees. A Task Force by definition is tasked to accomplish a needed

380    improvement, that is challenging to accomplish, without direct participation by a diverse array of

381    stakeholders, bringing multiple perspectives to a collective enterprise, in particular a public entity,

382    CUNY, receiving Federal funding by specific statute, as in the case of an MSI, BMCC

383       Plaintiff learned, never once in person or by telephone, but solely and exclusively from

384    dismissive, punitively worded, emails that contained allegations and unfounded assertions by 2

385    named Defendants, Professors Bishop and Salam, Social Sciences, that Plaintiff's 20- year

386    continuous, uninterrupted and invited contractual service would be (albeit discriminatorily,

387    arbitrarily and summarily) terminated.

388       These 2 Defendants in the Department of Social Sciences asserted action was taken by

389    them, against Plaintiff, because:

390    [1] Plaintiff taught her students 4 online interactive classes (out of 32 classes), during <u>one</u>

391    <u>(1)</u> 16-week semester, Spring 2018,

392    [2] Plaintiff drew attention to the conduct of "Student" by contacting Office of Student

393    Affairs, and that Plaintiff failed to manage this 1 student's repeated non-compliance with signed

394    and agreed upon Syllabus requirements between each Student and Plaintiff. Plaintiff asserts that

395    since named Defendants in the Office of Student Affairs had established a BART Behavioral

396    Assessment Response Team mechanism, operating since 2012, for monitoring and modifying

397    student conduct, any Professor, under the above- referenced dispensation of BART, is not

398    permitted to take any action re: students' conduct, except **refer** any student, to OSA/BART for

399    timely effective intervention, by OSA/BART.

400    Judge, let it be noted [1] and [2] above, comprise the sum and substance of Department of

401    Social Sciences' discriminatory employment action against Plaintiff.

402    On [1] Plaintiff argues that she followed all specific and general guidelines set forth in the

403    Adjunct Faculty Handbook version obtaining in Spring 2018.  The Adjunct Faculty Handbook

404    2018 is the prime contractual instrument that defines adjunct faculty teaching service to the college

405    and the university during any semester including Spring 2018. This same Adjunct Faculty

406    Handbook in its opening comprehensive statement says:

407    "Expectations for Adjunct Faculty
408    Adjunct faculty are expected to strive for excellence in teaching. BMCC's highest priority is to improve
409    student success, so all faculty are encouraged to develop effective pedagogy. BMCC's student
410    population is culturally and linguistically diverse, many of whom are the first in their families to attend
411    college; research shows that our students benefit from active engagement both inside and outside the
412    classroom. All faculty are required to submit verification of attendance, final grades, and any other
413    required information on time. All faculty are required to use their BMCC email and check it regularly.
414    Faculty are encouraged to use the wide range of resources available to support academic excellence and
415    to share their own expertise in the spirit of contributing to a vibrant learning community and to BMCC's
416    commitment to student success."
417    --------------------------------------------------------------------------------

418    On [1] Plaintiff further argues that 4 out of 32 classes in a 16-week semester emphatically

419    do not constitute an online course, by BMCC's own definition. First, Blackboard is available to

420    ALL faculty. Second, BMCC itself has noted 2 (two) definitional criteria for online teaching in

421    any semester:

422         "Hybrid" courses are taught 50% online

423         "Fully online" courses are taught 100% online.

424         In a decade, when all colleges are scrambling to provide increased online instruction to

425    students (who often are far ahead of faculty in their use of applications, platforms, architecture and

426    digital environments) BMCC was concerned that my students got 4 classes of intensive assigned

427    readings and in-textbook research, for beginning students who only 'read' their smartphone

428    screens! A Pathways Psychological Science course urgently needs to encourage reading and

429    writing in a sustained manner at the student's own pace with in-built movement from assignment

430    to assignment. My students, because they read researched and wrote intensively for 4 online

431    sessions, undisturbed and interacting with Plaintiff, expressed surprise that there so many "ideas"

432    meaning theorists and theoretical perspectives about the Science of Behavior" "PSYScience of *i*"

433    (my own coinage) is the science closest to our beginning students' own personalities and daily

434    lives, when they study STEM courses.

435         My syllabus delivery in Spring 2018 was _neither_ hybrid nor fully online, as proven by the

436    fact, alleged and acknowledged by named Defendant Bishop, chair Social Sciences that I taught 4

437    out of 32 classes online.

438         One-eighth of all classes is not 50% and certainly not 100%.

439         Therefore, employment termination, on the basis of [1] violates my union contractual

440    obligation of syllabus delivery as per Adjunct Faculty Handbook applicable to all adjunct faculty.

441         Further elucidating [1], "Lecture Format" frequently includes Face-to-Face [FtF] classes in

442    which no lecture occurs.  A PowerPoint presentation or a video or movie, sometimes for the

19

443    entirety of the class period, in a darkened classroom where no active engagement occurs, is

444    Syllabus delivered without a "Lecture" by the Professor. A field trip to a museum or even taking

445    the class to a union demonstration against an adverse CUNY budget measure, by the Board of

446    Trustees (BoT) in which students and teacher are both engaged outside a seated physical classroom

447    does not involve Lecture format.  In fact, it is valuable at certain critical points in Syllabus delivery,

448    especially if a teacher wants students to read pages pre-assigned twice weekly, use critical

449    reasoning to demonstrate their understanding of a particular theorist's perspective, as well as to

450    develop and present their own point of view, for every assigned reading. Online Syllabus delivery,

451    after the first 3-4 successive, in-person, intensive FtF classes, allows students ( even those who

452    enter late) to start working immediately in an individualized, focused way, with the help of the

453    professor and/or their peers; interact with their peers to discuss their academic interests and future

454    job aspirations related to their course readings, despite a highly disruptive extended enrollment

455    period in recent years, including Spring 2018, favored by then College President (a named

456    Defendant) in which Enrollment is touted and aggressively carried out, at the expense of student

457    Attendance, the latter being a state-mandated requirement, for continued funding.

458        The plausible reasons for a disruptive extended enrollment strategy are possibly executive

459    compensation raises awarded to College Presidents for a variety of criteria, including, possibly

460    enrollment.  One significant event that I have noticed every semester, including Spring 2018, is

461    that there is a fall-off in Attendance **after** students receive their federal Pell grants! Something to

462    investigate for USDoE.

463        The point of this detailed explanation is to show that students who enter class on the first

464    day of class, ready to work, are not penalized by distractions or by late enrolling late arriving, or

465  suddenly departing, students who needed to change or drop courses for a variety of factors, often
466  beyond their control.

467      Case in Point: "Student" according to the on-site campus adviser, the late Peter Roberts
468  told Plaintiff that "Student" enrolled on the very last day of enrollment.  By the time "Student"
469  entered my course, she had become a casualty of the College President's enrollment policy,
470  missing the first 3 Face to Face intensive interactive Lecture Format classes, of a Pathways Science
471  course in Psychology that is required, to graduate.

472      I affirm from direct lived experience in my classroom during Spring semester 2018, "The
473  Student" was not even minimally well served from the beginning to the end of her enrollment
474  (with lack of Attendance) in my course, by either Social Sciences or Office of Student Affairs or
475  indeed the College President. "Plaintiff" holds them collectively accountable for not serving this
476  Student and possibly, others. The College President left BMCC service almost immediately
477  thereafter, so it was not possible to query him on negligence of service to "The Student." No true
478  teacher is content, unless every student in every one of her classes is served. "The Student"
479  deserved substantially better conduct support from OSA/BART, so she could become a successful
480  learner.

481      Defendant Bishop, Chair, Social Sciences violated Article 20. **Intent** of the collective
482  bargaining agreement on 2 counts:

483      She pre-emptively stated in an email 2/27 that instructing my students through rigorous
484  reading and response online 4 out of 32 classes was "grounds for non-reappointment" Plaintiff
485  found no such pre-emptive provision in the union contract or the Adjunct Faculty Handbook

486      Defendant Bishop then emailed me to provide "immediate assurance" that I would teach
487  my classes in person. I was delighted to do so. After I provided that "immediate assurance" within

21

488   hours, in a turnaround email that very same day **2/27**, she ignored my response. It was as if I had

489   never given her and other high-level functionaries that required and happily provided "immediate

490   assurance." I received no follow up email acknowledgment from Defendant Bishop that she had

491   either accepted or rejected my readily proffered "immediate assurance."

492        Article 20.1 Intent:

493   "The parties agree to use their best efforts to encourage the informal and prompt settlement of
494   complaints and grievances which may arise between the PSC, the employees, and the University. The
495   orderly processes hereinafter set forth will be the sole method used for the resolution of all complaints
496   and grievances."

497        Defendant Bishop instead, went straight for the jugular, alleging in her very fist email to

498   me, dated 2/27 that teaching 4 classes online out of 32 is "grounds for non-reappointment." This

499   pre-emptive overkill style of leadership without concerns for required due process had gotten

500   Defendant Bishop into trouble before in a case 16-cv-10562 filed against her by a male white self-

501   ascribed Latino professor in my same department just 2 years earlier, wherein he stated that a

502   Black student called him "a d….k" in front of the entire class."  That Plaintiff asserted Defendant

503   Bishop staid to him "How can I be racist? I am the victim of racism." Subsequent racial

504   discrimination against him by Defendant Bishop, followed. The case presided over by senior

505   district judge William Pauley III dismissed the case with Prejudice against Defendant Bishop and

506   Defendant President Perez. This aggrieved professor (whom I have never met or interacted with

507   in any way) was terminated 2016, when the College called Security on him and he was escorted

508   out of his own classroom. He had taken the action of calling Security on a racially offensive

509   Student.

510        "Plaintiff" similarly alleges that "Student" in my afternoon Section #1500 class, racially

511   profiled Plaintiff, upon first meeting me, face to face with the words "You suck.  You don't know

512   anything." As an Asian with Indian ethnicity, foreign born brown immigrant, it is reasonable for

513   me or any potential juror to adduce that she took in the **totality** of my protected physical

514    characteristics, and body language in that few moments when she made the statement in front of

515    approx. 6-8 attending students at the end of class 2/27.  She made this same statement again om 2

516    other occasions to me in class. It would be reasonable for me or any potential juror to adduce that

517    this student, bigger and certainly stronger than I, was reasonably certain, relying on prevailing

518    racialized stereotypes (even if these stereotypes are positive), about Asians, I would remain silent

519    in the face of her mocking verbal abuse, would not confront her or call Security for her removal.

520    I reported her unacceptable statement instead, later that day, after due consideration, to the office

521    of Student Affairs. Defendant Wentworth of OSA.   Apparently, he did not think it was necessary

522    to inform Plaintiff that he had the student sign some "some forms" and even later to disclose to me

523    that he had "closed the case" …. "quickly" **3/13.**  I was not informed until THREE weeks later

524    **4/6, long after midterms**

525        This signing of "some forms" given to her by Defendant Wentworth,  **3/13** apparently

526    emboldened  "Student" to continue to attend highly infrequently a few more classes during which

527    she repeatedly disrupted my class  (she stopped attending when she failed her midterms but stayed

528    online,  did no further Syllabus assignments,  avoided being observed by not attending,  **3/22**

529    ordered by Dean Erwin Wong of Academic Affairs, entered and left multiple times my class **3/13**,

530    came into my office **3/27,** attempted to grab midterm exam scans from my left hand, exiting my

531    office abruptly when she learned her score. This last contact incident of **3/27** was observed by an

532    eyewitness, an HEO assigned from Academic Affairs to my offsite campus and upon information

533    and belief is supervised by Defendant Antonette McKain, of Academic Affairs who initially

534    emailed my Department on my 4 classes of online instruction, at CITH.

535        BMCC Defendants Bishop and Salam violated Plaintiff's rights and protections under

536    union contract Article 8

537        **Article 8: Non-Discrimination**

538        <u>8.1</u> Neither the University nor the Union will interfere with, restrain or coerce the

539        employees covered by this Agreement because of membership in or non-membership in or lawful

540        activity on behalf of the Union. Neither the University nor the Union will discriminate in respect

541        to hire, tenure of employment or any terms or conditions of employment of any employee covered

542        by this Agreement because of sex, race, national origin, religion, sexual orientation, political belief

543        or membership in, or lawful activity on behalf of the Union. The University and the Union shall

544        comply with applicable provisions of federal, state and municipal laws and ordinances regarding

545        discrimination in employment because of age or because of disability.

546

547        I assert I was discriminated on the basis of my lawful, protected union activity of

548        employment.

549        1.  Defendant Perez violated provisions for hiring and retention of adjunct faculty during

550            the 5 year "pilot phase" by discriminatory "non reappointment" Pilot" by definition

551            means that decisions and actions are taken after conclusion of the pilot, which is an

552            experimental study phase, before a plan is formulated, unless the pilot is suspended.  It

553            was not.

554                          **Multi-year Appointments for Teaching Adjuncts**

555                                         June 16, 2016

556        l. The parties will enter into a pilot program for five academic years beginning with

557            the 2016-2017 academic year through the end of the 2020-2021 academic year.

558            Three-year appointments made within the five-year period shall remain in effect

559            for the term of each appointment. The parties will meet no later than June 30,

560            2020, to determine whether to continue the pilot program as specified in this

561   Agreement or to modify the pilot program. If the parties are unable to agree to

562   continue or to modify the pilot program, the terms regarding adjunct appointments

563   will revert to those expressed in the 2007-2010 collective bargaining agreement.

564 2. An employee who has served as a teaching adjunct and who has taught at least six (6)

565   contact teaching hours per semester within the same department of the college for the

566   10 most recent consecutive semesters (excluding summer sessions) preceding the

567   effective date of the three-year appointment shall be considered for a three-year

568   appointment, subject to the comprehensive review and assessment referenced in

569   paragraph "4" below. Up to four semesters of substitute service in a teaching title within

570   the same department of the college may be counted as qualifying service. **The first**

571   **three-year appointments** shall begin in the Fall 2017 semester and will continue to be

572   available starting in each fall semester through Fall 2020. Adjuncts shall be notified on

573   or before May 15 concerning appointment or non-reappointment for a three-year

574   period.

575   In rare instances in which a department Personnel and Budget Committee

576   determines that an eligible adjunct **will not be reappointed** to a **three-year**

577   **appointment** but could benefit from a **one-year appointment and additional**

578   **guidance,** the adjunct shall be appointed to a one-year appointment. At the **end**

579   **of the one-year appointment,** the **adjunct must be considered for a three-year**

580   **appointment.**

581 3. As a **one-time transition due** to the implementation of this *pilot* program, those

582   adjuncts who have taught at least six (6) classroom contact hours per semester within

583   the same department at the same college for 14 out of the last 18 consecutive semesters

584   (excluding summer sessions) preceding the 2016-17 academic year including the four

585   semesters (excluding summer sessions) immediately preceding the 2016-17 academic

586    year and who are eligible for a two-semester appointment for the Fall 2016 and Spring
587    2017 semesters under Article 10.1.(a)3., -- shall receive a two-year appointment for the
588    **2016\* 17 and 2017-18** academic years, without the necessity of a comprehensive
589    review, but subject to **sufficiency of registration** and **changes in curriculum.** Up to
590    four semesters of substitute service in a teaching title within the same department of
591    the college may be counted as qualifying service. An adjunct who believes that he/she
592    meets the eligibility requirements for this two-year appointment must file a notice of
593    interest with his/her department chair no later than October 15, 2016. Filing a notice of
594    interest shall be a precondition to receiving consideration for a two-year appointment.
595    It is understood that adjuncts who receive these initial two-year appointments will
596    receive a comprehensive review during said period and will be considered for a three-
597    year appointment effective beginning in the 2018-19 academic year, on the same basis
598    as other adjuncts, as set forth in paragraph "4" below. Adjuncts who file a notice of
599    interest shall be notified on or before February 1, 2017, confirming their appointment
600    to a two-year appointment or notifying them of their lack of eligibility therefor.

601    4.   To receive a three-year appointment, an adjunct who meets the service requirements
602        must receive the positive recommendation of his/her department P&B committee and
603        of the college President, or his/her designee [e.g., Provost, Dean]. The
604        recommendations shall be based upon a comprehensive review of the adjunct's
605        performance and the fiscal and programmatic needs of the department and/or the
606        college.

607    5.   Adjuncts who receive three-year appointments shall be considered for a subsequent
608        three-year appointment, subject to a comprehensive review of the adjunct's
609        performance and an assessment of the fiscal and programmatic needs of the department
610        and/or the college, as referenced in paragraph "4" above. Consistent with paragraph "2"
611        above, if an adjunct serving in a three-year appointment is appointed to teach as a
612        substitute in the same department of the college within the three-year period, such
613        substitute appointment shall not serve to disqualify the adjunct from consideration for

26

614     another three-year appointment as an adjunct at the conclusion of the current three-year
615     appointment period or thereafter, if the substitute appointment continues beyond the
616     conclusion of the current three-year appointment period but ends within the pilot
617     period. Consistent with section.

618  6.   6.4.d of the Bylaws of the Board of Trustees, there is no presumption of continuous
619       appointments. **Adjuncts shall be notified on or before May 15 th of the <u>third year of</u>
620       <u>their current three-year</u> appointment concerning reappointment or non-
621       reappointment for a successive three-year period.**

622  7.   During the three-year appointment period, the adjunct shall follow existing
623       departmental policies regarding student evaluations; it is understood that the weight to
624       be accorded student evaluations in the comprehensive review process is a matter of
625       academic judgment. At least one 50-minute teaching observation shall be conducted
626       during the three-year period, **[Social Sciences failed to undertake teaching**
627       **observations]**

628  8.   During the three-year appointment period, the adjunct shall be assigned a minimum of
629       six (6) classroom contact hours in each Fall and Spring semester but shall have no
630       entitlement to a particular course(s) or schedule.

631  9.   Should a department be unable to offer an adjunct a minimum of six (6) classroom
632       contact hours in a given semester, the department chair shall offer the adjunct either:
633       A) an academically appropriate non-teaching adjunct appointment in the current
634       semester for an equivalent number of hours at the non-teaching rate; or B) an additional
635       teaching assignment of the number of hours of the contact hour deficit within the
636       following two semesters or summer session. For those adjuncts who receive their
637       primary health insurance by virtue of their adjunct employment at the college and who
638       would lose the health insurance if their assignment at the college fell below six (6)
639       contact hours in any given semester, department chairs shall make every effort to give
640       such adjunct a nonteaching assignment in the same semester as the contact hour deficit
641       sufficient to maintain health insurance; for these purposes only, one non-teaching hour
642       shall be deemed equivalent to ().4 teaching contact hour.

27

643       A semester in which an adjunct's workload falls below six (6) contact

644       hours for reasons other than his/her declination to teach continues to count as 6

645       contact teaching hours of service toward eligibility for the following: subsequent

646       three-year adjunct appointments; movement in salary schedule (Article 24.2.(b));

647       waiver of tuition (Article 29.3); Adjunct

648       Professional Development Fund (Appendix B).

649 10. An adjunct may discuss with his/her department chair his/her course and scheduling

650    preferences. The department chair may consider the adjunct's expressed preferences -

651    just as the expressed preferences of full-time faculty are considered -- but the

652    department chair retains the final authority to determine who will be assigned to teach

653    which courses and when the courses will be offered. If an adjunct declines to teach

654    more than one course as assigned by the department chair during the three-year period,

655    the three-year appointment shall be considered null and void.

656       Notwithstanding the above, an adjunct serving in a three-year appointment

657    may seek to be excused for up to one semester upon the submission of

658    documentation satisfactory to the college's Office of Human Resources

659    establishing the need for such owing to l) the adjunct's own illness; 2) the need to

660    care for an ill member of the adjunct's immediate family; 3) the need to care for a

661    newborn child or a newly adopted child, adopted at up to five (5) years of age; or

662    4) receipt of an academic grant or fellowship that involves fulltime commitment

663    or absence. If approved, such one-semester break in service shall not serve to

664    disqualify the adjunct from consideration for another three-year appointment at

665    the conclusion of the current three-year appointment.

666 11. Adjuncts who receive a [two-year] or three-year appointment under this provision will

667    earn 12 contact hours per year of personal illness/emergency leave, which may be

668    accrued up to a maximum of [36 contact hours] Adjuncts who are reappointed to a

669    three-year appointment may carry over up to 36 contact hours of leave. An adjunct is

670     not entitled to carry over the leave to an appointment other than a three-year

671     appointment, nor is an adjunct entitled to receive a payout for unused days.

672     I l . Adjuncts who receive a three-year appointment continue to be subject to

673      discharge for just cause, subject to the Grievance and Arbitration article (Article

674      20) and not to Article 21 of the collective bargaining agreement.

675     BMCC and CUNY violated due process requirements  of CUNY's EO and ND.

676

677      Any potential juror's careful reading of "THE CITY UNIVERSITY OF NEW YOK

678 POLICY ON EQUAL OPPORTUNITY AND NON DISCRIMINATION" as obtaining in the year

679 of Spring 2018, might reasonably infer that Defendant President Perez  did not follow the mandated

680 requirements for due process contained in this document and actually terminated Plaintiff's service

681 while the CDO was investigating [Pages 1-17 appended]

682

683      Plaintiff alleges that Defendant Perez egregiously violated due process provisions, filing

684 provisions, data gathering provisions of **CUNY own EO&ND Policies and Procedures,** in all

685 procedural details by **terminating** my service while his hand-picked CDO had not even begun

686 begun collecting data in real time on my Complaint filed with her Office **3/18**.

687      Plaintiff further respectfully requests this court to order Defendant Perez to provide proof

688 that an investigation was conducted as per CUNY own EO&ND and a report was released.  No

689 such report, nor even a required Complaint FORM was ever given to this Plaintiff, for filing and

690 submission by Plaintiff to CUNY.

691     **I.  Policy on Equal Opportunity and Non-Discrimination**

692        The City University of New York ("University" or "CUNY"), located in a historically

693    diverse municipality, is committed to a policy of equal employment and equal access in its

694    educational programs and activities.  Diversity, inclusion, and an environment free from

695    discrimination are central to the mission of the University.

696

697        It is the policy of the University—applicable to all colleges and units— to recruit, employ**,**

698    **retain,** promote, and provide benefits to employees (including paid and unpaid interns) and to

699    admit and provide services for students without regard to **race, colo**r, creed, **national origin,**

700    **ethnicity**, ancestry, religion, **age,** sex (including pregnancy, childbirth and related conditions),

701    sexual orientation, gender, gender identity, marital status, partnership status, disability, genetic

702    information, alienage, citizenship, military or veteran status, status as a victim of domestic

703    violence/stalking/sex offenses, unemployment status, or any other legally prohibited basis in

704    accordance with federal, state and city laws.1

705

706        It is also the University's policy to provide reasonable accommodations when appropriate

707    to individuals with disabilities, individuals observing religious practices, employees who have

708    pregnancy or childbirth-related medical conditions, or employees who are victims of domestic

709    violence/stalking/sex offenses.

710

711        This Policy also prohibits retaliation for reporting or opposing discrimination or

712    cooperating with an investigation of a discrimination complaint.

713        Prohibited Conduct Defined

714    Discrimination is treating an individual differently or less favorably because of his or her

715    protected characteristics—such as race, color, religion, sex, gender, national origin, or any of the

716    other bases prohibited by this Policy.

717    As a public university system, CUNY adheres to federal,

718    state and city laws and regulations regarding nondiscrimination and affirmative action.  Should

719    any federal, state or city law or regulation be adopted that prohibits discrimination based on

720    grounds or characteristics not included in this Policy, discrimination on those additional bases will

721    also be prohibited by this Policy.

722    **Retaliation is adverse treatment of an individual because he or she made a**

723    **discrimination complaint, opposed discrimination, or cooperated with an investigation of a**

724    **discrimination complaint.**

725    II.   Discrimination and Retaliation Complaints

726    The City University of New York is committed to addressing discrimination and retaliation

727    complaints promptly, consistently and fairly. There shall be a Chief Diversity Officer at every

728    college or unit of the University, who shall be responsible for, among other things, addressing

729    discrimination and retaliation complaints under this Policy. There shall be procedures for making

730    and investigating such complaints, which shall be applicable at each unit of the University.

731    IV.  Responsibility for Compliance

732    The President of each college of the University, the CUNY Executive Vice Chancellor and

733    Chief Operating Officer, and the Deans of the Law School, Graduate School of Journalism, School

734    of Public Health and School of Professional Studies and Macauley Honors College, have ultimate

735    responsibility for overseeing compliance with these policies at their respective units of the

736    University. In addition, each vice president, dean, director, or other person with managerial

737    responsibility, including department chairpersons and executive officers, must promptly consult

738    with the Chief Diversity Officer at his or her college or unit if he or she becomes aware of conduct

739    or allegations of conduct that may violate this policy.  All members of the University community

740    are required to cooperate in any investigation of a discrimination or retaliation complaint.

741    Part of Policies and Procedures adopted and approved effective November 27, 2012,

742    Cal.No.4; and revised policy amended and adopted December 1, 2014, Cal. No. C., with effective

743    date of January 1, 2015; Cal. Item C.

744    **COMPLAINT PROCEDURES UNDER THE CITY UNIVERSITY OF NEW**

745    **YORK'S POLICY ON EQUAL OPPORTUNITY AND NONDISCRIMINATION1**

746    **1.   Reporting Discrimination and/or Retaliation**

747    The University is committed to addressing discrimination and/or retaliation complaints

748    promptly, consistently and fairly.   Members of the University community, as well as visitors, may

749    promptly report any allegations of discrimination or retaliation to the individuals set forth below:

750    A.  Applicants, employees, visitors and students with discrimination complaints should

751    raise their concerns with the Chief Diversity Officer at their location.

752    C. There are separate procedures under which applicants, employees, visitors and students

753    may request and seek review of a decision concerning reasonable accommodations for a disability,

754    which are set forth in CUNY's Procedures on Reasonable Accommodation. (include link)

755    2.  Preliminary Review of Employee, Student, or Visitor Concerns

756    **Individuals who believe they have experienced discrimination and/or retaliation**

757    **should promptly contact the Chief Diversity Officer at their location to discuss their**

758    **concerns, with or without filing a complaint.**  Following the discussion, the Chief Diversity

759    Officer will inform the complainant of the options available.  These include seeking **informal**

760 **resolution of the issues** the complainant has encountered or the college conducting a full

761 investigation.  Based on the facts of the complaint, the Chief Diversity Officer may also

762                                                    1 These Procedures govern any complaint of discrimination

763 and/or retaliation, except complaints of sexual harassment and sexual violence, which are covered

764 by CUNY's Sexual Misconduct Policy.  These procedures are applicable to all of the units and

765 colleges of the University. The Hunter College Campus Schools may make modifications to these

766 procedures, subject to approval by the University, as appropriate to address the special needs of

767 their elementary and high school students.

768          These Procedures are intended to provide guidance for implementing the University Policy

769 on Equal Opportunity and Non-Discrimination.  These Procedures do not create any rights or

770 privileges on the part of any others.

771          The University reserves the right to alter, change, add to, or delete any of these procedures

772 at any time without notice.

773          advise the complainant that his or her situation is more suitable for resolution by another

774 entity within the University.

775          3.  Filing a Complaint

776          Following the discussion with the Chief Diversity Officer, individuals who wish to pursue

777 a complaint of discrimination and/or retaliation should be provided with a copy of the University's

778 complaint form. [To the best of Plaintiff recollection, she was never offered such a form]

779 Complaints should be made in writing whenever possible, including in cases where the

780 complainant is seeking an informal resolution.

781          4.  Informal Resolution

782        Individuals who believe they have been discriminated or retaliated against may choose to

783    resolve their complaints informally.  Informal resolution is a process whereby parties can

784    participate in a search for fair and workable solutions.  The parties may agree upon a variety of

785    resolutions, including but not limited to modification of work assignment, training for a

786    department, or an apology.  The Chief Diversity Officer will determine if informal resolution is

787    appropriate in light of the nature of the complaint.  Informal resolution requires the consent of both

788    the complainant and the respondent and suspends the complaint process for up to thirty (30)

789    calendar days, which can be extended upon consent of both parties, at the discretion of the Chief

790    Diversity Officer.

791        Resolutions should be agreed upon, signed by, and provided to both parties.  Once both

792    parties reach an informal agreement, it is final.  Because informal resolution is voluntary, sanctions

793    may be imposed against the parties only for a breach of the executed voluntary agreement.

794        The Chief Diversity Officer or either party may at any time, prior to the expiration of thirty

795    (30) calendar days, declare that attempts at informal resolution have failed.  Upon such notice, the

796    Chief Diversity Officer may commence a full investigation.

797        If no informal resolution of a complaint is reached, the complainant may request that the

798    Chief Diversity Officer conduct a full investigation of the complaint.

799    5.  Investigation

800        A full investigation of a complaint may commence when it is warranted after a review of

801    the complaint, or after informal resolution has failed.

802        It is recommended that the intake and investigation include the following, to the extent

803    feasible:

804        a.  Interviewing the complainant.  In addition to obtaining information from the

805    complainant (including the names of any possible witnesses), the complainant should be informed

806    that an investigation is being commenced, that interviews of the respondent and possibly other

807    people will be conducted, and that the

808    President2 will determine what action, if any, to take after the investigation is

809    completed.

810        b. Interviewing the respondent.  In addition to obtaining information from the respondent

811    (including the names of any possible witnesses), the respondent should be informed that a

812    complaint of discrimination has been received and should be provided a copy of the complaint

813    unless circumstances warrant otherwise.  Additionally, the respondent should be informed that an

814    investigation has begun, which may include interviews with third parties, and that the President

815    will determine what action, if any, to take after the investigation is completed.  A respondent

816    employee who is covered by a collective bargaining agreement may consult with, and have, a

817    union representative present during the interview.

818    The respondent must be informed that retaliation against any person who files a complaint

819    of discrimination, participates in an investigation, or opposes a discriminatory employment or

820    educational practice or policy is prohibited under this policy and federal, state, and city laws.  The

821    respondent should be informed that if retaliatory behavior is engaged in by either the respondent

822    or anyone acting on his/her behalf, the respondent may be subject to disciplinary charges, which,

823    if sustained, may result in penalties up to and including termination of employment, or permanent

824    dismissal from the University if the respondent is a student.

825       c. Reviewing other evidence. The Chief Diversity Officer should determine if, in addition

826    to the complainant, the respondent, and those persons named by them, there are others who may

827    have relevant information regarding the events in question, and speak with them. The Chief

828    Diversity Officer should also review documentary evidence that may be relevant to the complaint.

829    6. Withdrawing a Complaint

830    A complaint of discrimination may be withdrawn at any time during the informal resolution

831    or investigation process. Only the complainant may withdraw a complaint. Requests for

832    withdrawals must be submitted in writing to the Chief Diversity Officer. The University reserves

833    the right to continue with an investigation if it is warranted. In a case where the University decides

834    to continue with an investigation, it will inform the complainant.

835    In either event, the respondent must be notified in writing that the complainant has

836    withdrawn the complaint and whether University officials have determined that continuation of

837    the investigation is warranted for corrective purposes.

838    2 References to the President in these Procedures refer to the Executive Vice Chancellor

839    and Chief Operating Officer and the Deans of the Law School, Graduate School of Journalism,

840    CUNY School of Public Health, School of Professional Studies and Macauley Honors College,

841    wherever those units are involved, rather than a college.

842    7. Timeframe

843    While some complaints may require extensive investigation, whenever possible, the

844    investigation of a complaint should be completed within sixty (60) calendar days of the receipt of

845    the complaint.

846    8. Action Following Investigation of a Complaint a. Promptly following the completion

847    of the investigation, the Chief Diversity Officer will report his or her findings to the President. In

848     the event that the respondent or complainant is a student, the Chief Diversity Officer will also

849     report his or her findings to the Chief Student Affairs Officer.

850         b. Following such report, the President will review the complaint investigation report and,

851     when warranted by the facts, authorize such action as he or she deems necessary to properly correct

852     the effects of or to prevent further harm to an affected party or others similarly situated.  This can

853     include commencing action to discipline the respondent under applicable University Bylaws or

854     collective bargaining agreements.

855         c. The complainant and the respondent should be apprised in writing of the outcome and

856     action, if any, taken as a result of the complaint.

857         d. The President will sign a form that will go into each investigation file, stating what, if

858     any, action will be taken pursuant to the investigation.

859         e. If the President is the respondent, the Vice Chancellor of Human Resources

860     Management will appoint an investigator who will report his/her findings to the Chancellor.  The

861     Chancellor will determine what action will be taken.  The Chancellor's decision will be final.

862         9.  Immediate Preventive Action

863         The President may take whatever action is appropriate to protect the college community

864     in accordance with applicable Bylaws and collective bargaining agreements.

865         10. False and Malicious Accusations

866         Members of the University community who make false and malicious complaints of

867     discrimination, as opposed to complaints which, even if erroneous, are made in good faith, will be

868     subject to disciplinary action.

869         11.  Anonymous Complaints

870        All complaints will be taken seriously, including anonymous complaints. In the event that

871        a complaint is anonymous, the complaint should be investigated as thoroughly as possible under

872        the circumstances.

873        12. Responsibilities

874        a. Responsibilities of the President:

875        ☐ Appoint a Chief Diversity Officer responsible for addressing complaints under this

876        Policy

877        ☐ Ensure that the Chief Diversity Officer is fully trained and equipped to carry out his/her

878        responsibilities.

879        ☐ Ensure that managers receive training on the Policy. (Evidence needed that Soc Sci Dept

880        Chair received this training)

881        ☐ Annually disseminate the Policy and these Procedures to the entire college community

882        and include the names, titles and contact information of all appropriate resources at the college. t

883        Such information should be widely disseminated, including placement on the college website.

884        b. Responsibilities of Managers:

885        **Managers must take steps to create a workplace free of discrimination, harassment**

886        **and retaliation, and must take each and every complaint seriously.** Managers must promptly

887        consult with the Chief Diversity Officer if they become aware of conduct that may violate the

888        Policy.

889        For purposes of this policy, managers are employees who either (a) have the authority to

890        make tangible employment decisions with regard to other employees, including the authority to

891        hire, fire, promote, compensate or assign significantly different responsibilities; **or (b) have the**

892        **authority to make recommendations on tangible employment decisions that are given**

893   **particular weight.**  Managers include vice presidents, deans, directors, or other persons with

894   managerial responsibility, including, for purposes of this policy, **department chairpersons** and

895   executive officers.

896   c. Responsibilities of the University Community-at-Large:

897   ☐ Members of the University community who become aware of allegations of

898   discrimination or retaliation should encourage the aggrieved individual to report the alleged

899   behavior.

900   ☐ All employees and students are required to cooperate in any investigation.

901   **Executive Order 11246,** as amended, prohibits discrimination in employment by all institutions

902   with federal contracts and requires affirmative action to ensure equal employment opportunities.

903   Title VII of the Civil Rights Act of 1964, as amended, prohibits discrimination in

904   employment (including hiring, upgrading, salaries, fringe benefits, training, and other terms,

905   conditions, and privileges of employment) on the basis of race, color, religion, national origin, or

906   sex.

907   Title VI of the Civil Rights Act of 1964 prohibits discrimination or the denial of benefits

908   because of race, color, or national origin in any program or activity receiving federal financial

909   assistance

910   Age Discrimination in Employment Act, as amended, prohibits discrimination against

911   individuals who are age 40 or older.

912   **Plaintiff was discriminated due to her age, seniority based on years of service and**

913   **salary step increases through accruals of service with every year of service. Plaintiff was**

914   **present on campus when her replacement information was conveyed to the on-site College**

915   **Assistant.  Upon information and belief Plaintiff was replaced by a younger professor with**

916 **less age-defined seniority based on cumulative years of service, possibly without a doctorate**

917 **that also confers a higher starting step in salary.**

918     Americans with Disabilities Act of 1990, as amended, prohibits discrimination due to a

919 disability including as indicated in a recent court ruling on the basis of <u>temporal proximal</u>

920 <u>disability</u>. In Plaintiff's specific instance as "Student" s conduct events continued escalated and

921 worsened, unmediated by OSA, Plaintiff became increasingly more stressed and experienced

922 heightened threat perception from unpredictable performance of "Student" conduct, unmediated

923 by OSA's BART. Plaintiff was impelled to take 2 days of pre-announced stress-related leave, time-

924 related absence with heightened concerns for her personal safety, on a sub-campus with sub-par

925 safety facilities, example no turnstiles or carded entry.

926      Plaintiff experienced a temporal proximal disability 3/29, 4/10, leave dates occasioned by

927 stressful conduct against her, that was unmediated by OSA, causing Plaintiff to miss work.

928 "Student"s conduct was actively and purposefully unmediated, Plaintiff experienced "heightened

929 threat perception" "Student aggressed upon her in 2 separate incidents in the early and late

930 afternoon 3/27, 1 incident  in late afternoon was eye witnessed by college HEO.

931     Details are herein included, by date sequence from first day of my courses:

932 <u>**Calendar -- Discrimination/Retaliation/Contractual Breach Events Spring Semester 2018**</u>

933     1/30 Faculty Plaintiff teaches her first class of Spring 2018. All students who have not yet

934 done so, self-enroll in online program Blackboard and access Paper I guidelines to complete an in-

935 class assignment -- An Early Childhood Memory. 10 Syllabus completion points automatically

936 awarded if all guidelines, specific to Paper 1, are followed.   Course Prep assignment (between

937 class meetings) to be completed before next class, requires Students to read Syllabus inside

938 Blackboard, engage with peers and Instructor by posting written comments about Syllabus

939    specifics and individually sign off <u>agreeing</u> they will fulfill ALL Syllabus requirements. "The

940    Student" does not attend.  Faculty Plaintiff enforces CUNY Attendance requirements.  Why? All

941    higher ed research demonstrates a positive correlation between student attendance, retention,

942    completion and graduation without costly delays especially for under-funded public  colleges

943    including BMCC/CUNY

944    **2/1** Plaintiff teaches her second FtF class. This is an interactive class with all attending

945    students signed into Blackboard to follow Syllabus, work independently while interactive FTF

946    demonstration Lecture is in progress. Q. is How did PSY become the Science of I [Plaintiff own

947    coinage]? How did Psych. become a scientific Discipline? I ask students if they think they 'did'

948    Science on our first day of class when they wrote Paper I.  How? They begin a list of keywords

949    they provide (and I assist) in their notebooks or phones to show how Psychological Science 'gets

950    done' – keyword list includes observing, remembering, writing, note-taking, recording, journal,

951    diary, personal data, memory, childhood, life stages, analysis, categories, qualitative, quantitative,

952    metadata. Students practice role play in research.  Students who did Paper I, get their Papers back

953    with instructions to Save until end of semester. Students who just joined class, (due to BMCC

954    President's policy of extended enrollment at under VoE, at the expense of retention and NYS-

955    mandated attendance requirements, complete their Paper I in the Student Lounge and in my shared

956    Office.

957    **2/6** Plaintiff teaches her 3rd successive FtF class.  Students who attended from the first day

958    are already becoming completing their online course prep and readings, while students who missed

959    the 1st 2 classes (as a partial consequence of President Perez extended strategy to garner enrollment

960    at the expense of NYState-mandated attendance requirements) these later arriving students

961    complete Paper 1, before or after my course hours and must catch up with online coursework,

962    before they can move on to the next twice- weekly assignment

963    Course prep for next class which will be conducted online, requires Blackboard-based in-

964    textbook research that involves close reading of pre-assigned textbook pages, picking out

965    keywords and looking them up, for 2nd of 10 Theoretical Perspectives [TP] answering questions

966    and posing their own questions.  Students must complete TP 1, before moving onto TP2 each at

967    their own pace but restricting delays in moving from one assignment to the next.

968    "The Student" does not attend. By now she has missed 1 core paper, did not show up to

969    write Paper I outside of my class hours, missed 3 classes, 3 course preps.

970    All higher ed research demonstrates a positive correlation between student attendance,

971    retention, completion and graduation without costly delays especially for publicly funded

972    universities including CUNY.  (Faculty Plaintiff views herself as a Public Citizen and a Public

973    University Teacher.)

974    2/8 2/13 2/15 2/22

975    Students and I continue on Blackboard <u>after</u> our 3 initial  intensive FTF classes, now  for 4

976    contiguous online sessions dated above,  to become familiar sequentially, with 4 of 10 Theoretical

977    Perspectives [TP] in Psychological Science 2/8 2/13 2/15, which included 1 intervening CUNY

978    holiday, 2/22 to intensively read 5-7 assigned TP pages per online session, write answers drawn

979    from each TP reading and interact with me and with their peers on the readings of TP 3

980    Psychoanalytic  TP 4 Behaviorism  TP5 Cognitive.  TP 6 Social Cognitive.

981    "Student" did begin to attend 2/9, 1 day late, + missing her first three classes.  It is a benefit

982    of Blackboard 24/7 access, very valuable for CUNY students many of whom have to work to pay

983    their way and earn their livelihood, (just as I, Plaintiff did, as a foreign student at Columbia U)

984  after missing successively, 3 FtF classes at the start of the Spring semester, to commence and

985  complete assignments. "Student" signed the required agreement to fulfill all syllabus coursework,

986  accessible at any time on Bb.   However, she did <u>not</u> and never did submit the first assignment of

987  the first day of classes, Paper I. Paper and its sequel Paper II cumulatively account for 25 % of a

988  course grade. "Student" was offered numerous opportunities and reminders to do so, on campus,

989  outside of class hours, as all students did, (see above) if they missed the first day of classes. The

990  archived Blackboard course (available during Discovery) for my Spring 2018 classes will show

991  that this student began to do less and less work to fulfill twice-weekly online course prep

992  assignments (between in-class interactive instruction that involved role play, scripting and other

993  and she attended FtF classes infrequently.

994      2/27 – Students and I return to FtF classes for the remainder of the semester that ends 5/17.

995  Plaintiff was by then terminated 5/11 but continuing to fulfill her professional responsibilities.

996      In this 2/27 FtF session, 36 minutes of 2/27 class time go to students describing their online

997  classwork pros and cons, while reading aloud their entries on Blackboard to their peers.  Many

998  were surprised that Psych had so many "theorists."  # said they thought before they started the

999  course Psych was "much simpler" 2 students said they thought Psych was about psychologist's

1000  "mind-reading" and helping people with problems including criminality. 37 minutes were given

1001  to interactive, partly demonstration Lecture on TP Humanistic as I have never in 40 semesters of

1002  teaching stuck my students in front of Powerpoint slides and have them passively copy from them.

1003  Videos are also assigned for online course prep outside of FtF classes. In the last 3 minutes of

1004  class, while I was engaging with students in the left half of class, "The Student" said loudly "You

1005  suck.  You don't know anything." For what seemed like an endlessly long minute, I saw my new

1006  students whom I was just beginning to get to know, look at me, waiting for me to respond. I was

1007  momentarily shocked into silence in the middle of what I was saying to another student. Culturally,

1008  as an Asian Indian, I remained silent, too shocked to speak but trying to avoid making the situation

1009  worse in front of students who were looking on and whom I was just beginning to get to know.

1010  "Student" s cold, hostile demeanor struck me, a psych teacher for 20 years, as unusual, not the

1011  norm, in a classroom.

1012  **2/27** Plaintiff received an email from Defendant Bishop "making a 'change to your

1013  schedule' are grounds for non-reappointment." She attached a letter dated 2/25 from Defendant

1014  McKain, whom I have never met, complaining about my online classes, she further claimed to

1015  Defendant Bishop in the email she could not reach me even though we are all on the same server

1016  we all share! I easily found her on the College list serv, it's very accessible and helpful.

1017  2/27 Defendant Bishop changes her phrasing from "grounds for non-reappointment" to

1018  "if this is correct, then this is unacceptable." She requires an "immediate assurance' to

1019  teach 'all classes FtF.  It may be noted that the classes are cataloged for BMCC students as "Lecture

1020  Format" not FtF. Nowhere in the catalog are they referred to as FTF, but as Lecture Format. I had

1021  no difficulty giving her the "immediate assurance" she sought, in fact I was delighted and relieved,

1022  same day 4 hours later, before leaving my Inwood campus upon completing my "professional

1023  hour" on my campus.

1024  **2/27** I, Plaintiff write the following "immediate reassurance" that Defendant Bishop

1025  requested

1026  "Subject:" "FtF classes will continue"

1027  As stated, FTF classes will continue as they have from the very first day of the semester."

1028  Despite the "immediate assurance" I provided to <u>all</u> Defendant recipients, the union, and

1029  the CDO, Defendant Bishop ignored my "immediate assurance" gave me <u>no</u> indication whatsoever

1030  that she wanted me to provide additional serial reassurances in person (I have only seen her once

1031  in 20 years) by telephone, on email, on Twitter (!) to calm her.  This autocratic overkill response

1032  is precisely what got her into trouble in Trujillo v BMCC case SDNY 2016 wherein Defendants

1033  President Perez and Social Sciences Chair Bishop's pleadings were dismissed with Prejudice. I

1034  will stand corrected, <u>if</u> I have misread that case brought by my adjunct faculty comparator in 2016

1035  (never met him) during a period when BART already in place for 4 years, since 2012.

1036  **2/27 Plaintiff asserts** Declining to acknowledge and act constructively, as per PSC union
1037  contract provisions, following my immediate turnaround written "assurance" that she herself required
1038  me to provide, Defendant Bishop demonstrates she **violated Article 20.1 Intent** as herein quoted
1039  Contract PSC union Article 20.1 **Intent:**

1040  The parties <span style="color:red">agree to use</span> their <u>best efforts</u> <span style="color:red">to encourage the</span> <u>informal</u> and prompt <span style="color:red">settlement</span>

1041  of complaints and grievances which may arise between the PSC, the employees, and the

1042  University.

1043  The orderly processes hereinafter set forth will be the sole method used for the **resolution**

1044  of all complaints and grievances.

1045  Plaintiff asserts the violation by the Chair of the Social Sciences Department of a CUNY -

1046  wide collective bargaining agreement, is the complete denial of **<u>"informal"</u>** processes and "prompt

1047  settlement" as stipulated above in Article 20.1 Intent. Defend Bishop chooses Retaliation against

1048  my protected activity as a Faculty member under union-protected contract for the semester, but

1049  Retaliation for my union activities in general during a College reaccreditation process through

1050  Middle States (details below under "whistleblowing activities")

1051  I emailed Defendant McKain letting her know I had no trouble finding her on our server

1052  and asked her, in my email if making a person "invisible" was how she preferred to interact.  I

1053  received**,** no reply.  "The Invisible man" is a landmark in Black literature and now here she is,

1054    turning around and making me a brown AAPI immigrant "invisible". This points to an under-

1055    played instance of systemic, structural racism that frequently goes unacknowledged and

1056    unchallenged at BMCC.

1057      **3/6** Peter Roberts, a parttime student adviser on my campus, who unbeknownst to many of

1058    us, was already terminally ill, informs me in person and I confirm in writing our face-to-face

1059    conversation that he has met with Student **3/6,** "Student" will no longer be attending my class.

1060    Roberts a respected, beloved friend once said to me "I'll be lucky if I ever get out of here alive,"

1061    He did not. He died in service at BMCC. If a Black professional with an observable ocular

1062    disability can be made by BMCC to feel this way, Plaintiff's heartfelt question is Who is exempt

1063    from an unchallenged racialized discriminatory environment? A brown Asian female immigrant,

1064    in late adulthood, who is in a minority among minorities, a   pro-equity and professional parity

1065    union activist, persevering in whistleblowing on discriminatory retaliation and exclusion,

1066    ultimately ending in termination?

1067      The **3/6** decision by Peter Roberts, to make an alternative arrangement, 3 weeks later, right

1068    around VoE submissions by faculty to the Registrar re: "Student", was overturned …by whom?

1069    Discovery, following my pleadings herein, may yield an answer. "Student" continued to be

1070    allowed to attend despite her serial continuation of conduct events.

1071      **3/12** Defendant Bishop, to her credit, herself says in an email to Defendant Wentworth "I

1072    am a little confused. What you are saying seems to imply that she ("Student") can continue in the

1073    class she is currently in."

1074    "Student" Conduct is explicitly stated to be under BART purview, managed by Defendant

1075    Wentworth, his job title is Student Life Manager for Student Conduct and Academic Integrity

1076    **3/13** Defendant Wentworth writes to Defendant Bishop and several named Defendants, but

1077    never communicates with me until Spring Break **4/6**, though I have emailed him serially since

1078    February. **Defendant** Wentworth states**:**

1079    …"as far as the student conduct portion" [Plaintiff emphasis added!**] the case is closed** He goes

1080    on to write**. "I** have no say as to whether a student can return to a class academically."

1081    Fact is, "Student" conduct is neither under Defendant, Chair of Social Sciences Bishop's

1082    purview, nor under SocSci Faculty Plaintiff's purview, as BART, under Defendant Wentworth,

1083    has oversight of ALL conduct of ALL students, including, of course "Student." No students'

1084    conduct is exempt from BART purview.

1085    **3/13** "Student" arrives punctually has not prepared her reading on Research Methods,

1086    leaves and re-enters class several times, distracting other students and me, returns at one point with

1087    a considerable amount of loose toilet paper which toilet paper "Student" models into shapes on her

1088    desk.  Finally, exits class 25 mins early, I ask her to print her name in the Attendance roster, I give

1089    her only partial attendance for the in-class period. I enforce NYS mandated attendance as ALL

1090    faculty are required, no exceptions, to C&P NYS mandated ATTENDANCE requirements, into

1091    their Syllabus.  President Perez in contrast tout's enrollment at the expense of attendance, a focus

1092    that wreaks havoc on Student attendance.  (see VoE Roster for Spring 2018) in this pleading. Note:

1093    Plaintiff whistle-blows this procedure of enrollment v attendance in an attempt to enforce NYS

1094    mandated attendance requirement C&P in each Faculty syllabus. VoE was the centrepiece of

1095    President Perez' strategy to increase enrollment, at the expense of attendance. It disrupted students

1096    who were trying to attend class from the very first day of classes, while other students were caught

1097    up in late enrollment (meaning they missed classes, found they could not make up the work of

1098    those classes and dropped out of a course) Let me take the example of Spring 2018. Classes,

1099  meaning Attendance began **1/27**, mine began **1/30,** however Registrar was asking faculty for

1100  enrollment on students who had never attended even 1 class between **2/20 and 3/2**! In other words,

1101  a student could attend just 1 class or even perform 1 related academic activity and be considered

1102  for a Federal PELL! Students could attend 1 class or related activity and be considered as being in

1103  Attendance, however it was carefully called enrollment, not attendance.   It seemed like a scam

1104  that benefited the President but disrupted Syllabus delivery and student attendance for more than

1105  **4 weeks.**  but what was so troubling is that the students who attended from the first day and did

1106  work from the very first day had to deal with class disruptions as other students entered and left as

1107  part of an extended enrollment process.  In effect a student was considered to be in attendance if

1108  they attended once in more than 4 weeks! It was due to these staggered disruptive late enrollments

1109  that I assigned work on the very first day for which students received points counting towards their

1110  final grade, from DAY 1, and after 3 intensive face to face classes, Plaintiff spared regularly

1111  **attending** students from the enrollment gyrations of late **enrolling** missing-class students by

1112  intensifying reading assignments and written submissions work online. It also significantly helped

1113  late enrolling students to go online and begin working without losing time in travel and snow

1114  disruptions delays, typical of Spring semester, including in Jan-Feb of Spring 2018.

1115      **3/12** Defendant Wentworth, by now Plaintiff's own personal favorite Crown Prince

1116  Autocrat of BART, writes to Defendant Bishop but declines to cc me, (I know about this **3/12**

1117  email only AFTER my service is terminated, my exclusion maybe because I don't count, I am

1118  adjunct contingent brown immigrant who persistently engages in her protected whistle-blowing

1119  activity to challenge a racialized, hostile work environment and protected activity.

1120      **3/13** Defendant Wentworth using BART mechanism states he **"closed case" "quickly"**

1121  **even** while emails are flying between departments about how best to address above referenced

1122  "Student'" needs.! "Student" is frequently absent and missing work she had agreed to do, and

1123  signed up to do, per our Syllabus.  Defendant Wentworth closes "case" he has set up, no student

1124  of mine is ever reduced to a "case" in attendance rosters or syllabus materials and course delivery,

1125  Defendant Wentworth of his own accord, opens up "a case" then "closes it" "quickly", does not

1126  inform me directly but informs Chair Defendant, who in turn fails to inform me about a crucial

1127  decision taken by OSA under BART that negatively and discriminatorily impacts both "Student"

1128  and Plaintiff . Because the Department Chair Defendant Bishop does not inform me of a crucial

1129  decision, I inform her supervisor Provost Defendant Wilks. My action will count as 1 of several

1130  of my whistle blower instances of inequitable action and wrongdoing, against both Student and

1131  Plaintiff.  The **conduct issue that impedes "Student" success is not resolved on this crucial**

1132  **date 3/13**

1133  **3/13** On the very day that Defendant Wentworth "closed the case" "quickly" "Student"

1134  attends class, arrives punctually, leaves, re-enters classroom 3 separate times during a whole-class

1135  discussion, returns with a substantial amount of loose toilet paper that she proceeds to turn into

1136  shapes on her desk. Exits class 25 mins early without signing roster.  As she is about to leave, I

1137  remind her to sign the attendance roster by the exit door.  She does.  I award her partial attendance,

1138  will be added to other partial attendances, to calculate attendance of all students.

1139  **3/12** Defendant Salam announces Adjunct Faculty workshops. Subsequently Defendant

1140  Salam announces that these workshops stand canceled for lack of rsvp's indicating interest from

1141  adjunct faculty!

1142  **3/12** Defendant Salam in same email says "the College has made some changes in the last

1143  year (2017). Adjunct faculty and Plaintiff are hearing these for the first time about changes made

1144  last year!  She states Any additional absences will result in a reduction in your pay for the missed

49

1145   course. This is a policy that has always been on the books (Plaintiff asks What books?), but the

1146   College is now keeping track…. If a class (face to face class) is not held in person, that will count

1147   as an absence. Plaintiff asserts Nowhere in Defendant Salam's memo to ALL adjuncts does she

1148   state that any absence, especially causally related stress response to Student serial conduct events,

1149   would lead to termination of employment. FMLA itself would prohibit such an action.

1150      Plaintiff notes that missed classes (in my case emergency leave that was preannounced, to

1151   my Students, onsite staff and Department) are not stated by Defendant Salam as leading to

1152   Termination! Missed classes lead to salary cuts, NOT termination.   Upon information and belief,

1153   no other faculty comparators were terminated or even lost pay, due to an absence. The termination

1154   is especially ironic and does amount to targeted discriminatory retaliation for whistleblowing

1155   activities dating back to 2017 and earlier., as I have never taken even 1 leave since commencing

1156   my service to BMCC in Spring 1998.

1157      Partial List of Whistle Blowing protected union activities since Plaintiff's **Spring 1998**

1158   **start of BMCC service, that are causally related to Retaliation by Termination 5/11**

1159      **1.** Obtains free scan forms for adjunct faculty 1998 to achieve parity with Full time faculty.

1160      **2**. Obtains Computers in Adjunct Faculty Office, on an adjunct faculty-signed petition,

1161      presented by Plaintiff to then Vice President **3**. Emails President Perez that if he wants

1162      to create an environmentally sustainable BMCC campus as he claims he does, he can

1163      direct every department printer to be set on long edge option so that printing can default

1164      to double sided printing to save trees! Defendant Perez thanks me with a nice reply

1165      saying he will tell "Cabinet" about my suggestion **4**. Queries Defendant Perez'

1166      handpicked Faculty Dean why online classes cannot be taught through Peer faculty

1167      mentoring, which strengthens Faculty peer professional exchanges around Syllabus

delivery, a suggestion that was cc'd simultaneously to union President, Professor Bowen, English Department, Queens College union President often argues against what she calls "micromanaging" of the faculty enterprise by administration. **5**. Queries Defendant Bishop as to Plaintiff's interest in serving without pay on Academic Integrity committee/ working group, Defendant ignores Plaintiff's request **6.** Queries Defendants Wilks and Defendant Perez about Plaintiff request to serve without pay on Equity and Inclusion Task Force, learns that faculty comparators among adjunct faculty are totally excluded.

**7.** Plaintiff queries Vole/CoA approach to Enrollment conflated as Attendance as ALL Faculty are *mandated* **to** Copy and Paste NYS *attendance*, requirement, not enrollment, into their Syllabus**.**

**8.** Plaintiff Whistle blows  OSA's BART failed process to manage "Student" conduct, informs Plaintiff 's department namely Social Sciences, headed by Defendant Bishop, Office of Human Resources, (OHR) headed by Defendant Diaz, Academic Affairs, Defendant Wilks, Provost, email Office of Chief Diversity officer, emails PSC union to assert Faculty grievant rights **9**  Plaintiff queries Soc Sci and Academic Affairs about SEMESTER-LONG non delivery from 2/27  - 5/7  of hard copy mail to uptown campus as retaliation.  most competently prior to my whistle blowing activities especially in Spring 2018, across Department and Offices in connection with accreditation activities, enrollment v. Attendance activities **10,**  At or upon  termination 5/11, Plaintiff was on her uptown campus when the call came through to the onsite College Assistant assigning, upon received information and belief,  my Fall 2108 courses to a younger

1190          faculty at a lower salary step, fewer years of age-related seniority, therefore a cheaper

1191          "hire", an ADEA- violating  retaliation.

1192     **3/18** Following above-described serial in-class conduct events, I send a Letter of Complaint

1193     to name Defendant President Perez, drawing his attention, to a "racialized, hostile work

1194     environment with targeting by age, ethnicity, national origin, of the Complainant." I As a member

1195     of Adjunct faculty I had less protection to even make such a complaint. I fearlessly do. However,

1196     the situation had become almost intolerable by discriminatory action by both OSA and Soc Sci.

1197     My letter receives the attention of the Diversity Officer, as is required by law and The City

1198     University of New York Policy on Equal Opportunity and Non-Discrimination.   BMCC is

1199     mandated to follow a multistep procedure to address and redress a Discrimination Complaint.

1200     [Excerpted text inserted herein focuses on my proximate comparators, contingent labor adjunct faculty
1201     **Date of Letter of Complaint: March 18, 2018**
1202
1203     From:                                             To:
1204     Name of Complainant:                              Name of Employer: BMCC
1205     Dr. Chitra Karunakaran, Ed. D.                    Dr. Antonio Perez, President
1206     Contingent Faculty                                Odalie (sic) Levy, Esq. Diversity
1207     Social Sciences                                   Officer
1208     CUNY In the Heights Campus                        199 Chambers Street
1209     5030 Broadway                                     New York, NY 10007
1210     Room I – 104
1211     New York, NY 10034
1212
1213
1214     Complaint Letter addressed to College President, Defendant Antonio Perez and Chief Diversity Officer
1215     This Complaint Letter is Retaliated by Defendant Perez with his <u>Termination letter 5/11, 3 months **before** CDO
1216     investigation of my Complaint.</u>
1217
1218     <u>Title: A Hostile Work Environment</u>
1219
1220     My Complaint Letter is text-specific, data-driven and evidence based, focusing on BMCC admin.'s covert, ad
1221     hoc/post hoc mode of organizational dysfunction resulting in a generally unchallenged racialized, ageist <u>hostile
1222     work environment</u> for Contingent academic labor.  Control v Content admin. mode of daily operations places
1223     student-centric faculty professionalism as admin.'s <u>lowest possible priority.</u>
1224
1225      2-tier segregated and embedded Faculty structure of <u>lack of equity, inclusion</u> and patterned discrimination against
1226     <u>Contingent</u> labor who are de facto majority academic labor at the College.
1227
1228     blatant, sustained, patterned wage-income inequality, services/benefits inequality.

1229
1230   college admin.'s demand, in a repeated pattern, for <u>unpaid work</u> from Contingent labor.
1231
1232   denial of opportunities for <u>full college service to students</u>, by Contingent labor.
1233
1234   exclusionary tactics against Contingent labor in faculty governance, including during the Middle States re-
1235   accreditation process.
1236
1237   patterned instances of failure to permit Contingent labor to <u>initiate and implement faculty-driven adjudged best
1238   professional practices for syllabus delivery and student-centered learning outcomes.</u>
1239
1240   arbitrary requirement for <u>submissiveness and subordination</u> by Contingent labor to frequently covert, lurking
1241   admin., coercive punitive ad hoc/post hoc control of all Faculty including Contingent itinerant labor, conduit for
1242   such control is departmental chair proxies and designated surrogates.
1243
1244   patterned lack of facile communication strategies and transparency on the part of admin. in policies and
1245   procedures <u>particularly in matters of contingent faculty professionalism curriculum and syllabus delivery.</u>
1246   the issuance of an open emailed threat of non-reappointment, sent by the Social Sciences Department Chair to
1247   multiple recipients without prior information to the aggrieved, explicitly undertaken in violation of due process,
1248   and to cause sustained emotional distress through targeting for public humiliation of the above-referenced
1249   aggrieved Complainant., denying due process.
1250   Note: a maximum of 4 days of (unpaid) medical leave from teaching is requested by Complainant, to ameliorate
1251   the effects of Complainant's emotional distress and humiliation, occasioned by the threat of non-reappointment,
1252   by admin. surrogate Department Chair, Social Sciences,
1253   --------------------
1254
1255   All of the above are identified as intentionally patterned constitutive structures, practices and processes of BMCC
1256   admin. and surrogates/proxies that in combination have created a racialized, hostile work environment at the
1257   college with targeting by age, ethnicity, color and national origin, of the Complainant, in her capacity as Contingent
1258   labor, hired in Spring 1998, based on her credentials of a Columbia University doctorate in multidisciplinary social
1259   sciences and international education, and these credentials and competencies have been proven and tested in
1260   Complainant's continuous unblemished service to BMCC students since Spring 1998.
1261

1262        **3/20** CDO Levy confirms she will meet me by telephone **3/21** to discuss my 3/18 complaint

1263   of a Hostile work environment in which racially charged interactions go unchallenged or are made

1264   worse by negligence embedded in inter-departmental "turf" battles, to the detriment of both

1265   "Student" and "Plaintiff."  The remarkable email of **3/22** (below) sent by Dean Wong of Academic

1266   Affairs is thoroughly circumvented by Defendant Wentworth of Student Affairs.

1267        **3/22** Dean Wong blows open Defendant Wentworth 'case closed' "quickly" strategy by

1268   ordering a class observation of my Midterm Review class, critically important syllabus delivery

1269   date for both Plaintiff and ALL students. "Student" does not attend a critical Midterm Review

1270   class by the entire class (Attendance Record signed by Students available for **3/22**)

1271   In Plaintiff's private and hitherto unexpressed analytical view this BART Defendant

1272   urgently needs a "Me Too" moment in race relations.  Defendant Wentworth states earlier that

1273   "Student" does not have the same racialized reaction or general animus towards himself or Peter

1274   Roberts! Q. So is BART Defendant claiming "Student" cannot possibly have discriminatory racial

1275   animus against Plaintiff at the moment she mockingly and with a coldly hostile demeanor racially

1276   profiles Faculty Plaintiff, upon seeing her for the first time with "You suck.  You don't know

1277   anything." Repeats that same assertion 2 more times in class, growls at Plaintiff and physically

1278   aggresses her twice. Student's first conduct event occurs seeing her, not even actually meeting her,

1279   just seeing face to face, for the very first time. This "Student' repeats this mocking assertion, with

1280   a coldly hostile demeanor, 2 more times during specific moments in subsequent face to face class

1281   sessions.

1282   **3/22** A pivotal date ordered by Dean Wong, Vice President of Academic Affairs, AAPI

1283   Dean explicitly names and tasks Defendant Ian Wentworth to arrange for "The Student" to be

1284   observed, on the date of my Midterm Review. The Student did not appear.  Dean Wong's directive

1285   is strongly worded

1286   "The **disruptive behavior being described warrants intervention by Mr. Ian**

1287   **Wentworth in Student Affairs, who handles student behavior issues. By way of cc, I am**

1288   **alerting him, and he will act accordingly**."

1289   The "Student" does not appear for her Midterm Review class. Q.  Was she alerted to <u>not</u>

1290   appear on the day a class observation of a crucial Midterm Review class is scheduled? Discovery

1291   may yield the answer.

1292       (A projected Motion to Compel Discovery will attempt to find some answers from

1293       OSA/BART and in particular Defendant Wentworth)

1294       Plaintiff wonders Why didn't Defendant Wentworth follow up and complete the task Dean

1295       Wong had assigned him? Why didn't OSA set up another observation the next class **3/27** so that

1296       observational data could be gathered by OSA's own BART mechanism for follow up to facilitate

1297       the **success** of "The Student" who was impeded by her own conduct issues?

1298       **3/27** During Midterm Exam [Incident #1] "The Student" growls at me and snatches her

1299       exam + scan form from my hand. All other students present to take Midterm exam, cooperate by

1300       passing exams down their respective rows

1301       After conclusion of class and Midterm Exam, [Incident #2] "Student" comes to my office

1302       after all students have dispersed, (except 3 late students) directly from class.  "Student" suddenly

1303       steps towards me, loudly says "Gimme that" and attempts to grab her scan form and all students'

1304       scan forms I am holding in both hands. She makes the grab after I have stated her tallied score.

1305       She has failed her midterm, as she has also not submitted Paper I.  Eyewitness is HEO a with

1306       whom I have had interactions on an almost daily basis, all semester, very pleasant, competent

1307       caring and cooperative professional on whose desk I hastily place all my students scan forms.

1308       This new HEO hire, from whom I will expect to seek eyewitness testimony, (during Discovery),

1309       if my pleadings survive dismissal. This eyewitness is understood to be supervised by named

1310       Defendant Antonette McKain.

1311       After physically aggressing me "Student" exits rapidly.  Neither the HEO who is part of

1312       BMCC administration, nor I, call Security.

1313  4/6 Defendant Wentworth, in an email FW by him over Spring Break following Midterms,

1314  **directed** only to me**, no cc's to Defendants "**The case was closed rather quickly after being

1315  reported…. I was under the impression that Professor Bishop was following up with you**…"**

1316  3/29, 4/10 I pre-announce 2 leaves of absence, for the first time in 20 years of uninterrupted

1317  assignment. I inform my classes that I will be away due to "health and safety concerns", I ensure

1318  that my students in all sections learn directly from me on Bb while also informing Social Sciences

1319  in advance. Although I report the 2 incidents to OSA and Social Sciences I am not informed that

1320  any action is taken re: the 2 incidents by either OSA or SocSci.

1321  The CITH -- CUNY In the Heights sub-campus -- where I teach has sub-par security

1322  arrangements, not even turnstiles for pause and swipe entry. I am not certain I can be safe, as I

1323  have heard nothing from OSA or Soc Sci. This off-site campus has nowhere near have the same

1324  level of security arrangements as the Campus where ALL the Defendants sit! Plaintiff's

1325  observation in this court "What you stand for, depends on where you sit."

1326  **3/39 & 4/10** The Chair Defendant Bishop, as part of her stated job responsibilities, must

1327  assign a pre-announced leave replacement, whether paid or unpaid but she does not do so,

1328  **4/18** Defendant Salam email to Plaintiff, objects to my 2 preannounced absences -- **causally,**

1329  **temporally and proximally related --** to OSA Defendant Wentworth's serially discriminatory

1330  negligent actions re "Student" conduct, of her mocking verbal abuse (3) separate instances 2/27,

1331  3/27 hateful coldly hostile demeanor, **2/27/ 3/27**, growling 3/27, snatching scan form and exam

1332  3/27, attempted grabbing of scan form in Faculty office **3/27** (eyewitness)

1333  Plaintiff suffered escalating stress and heightened threat perception took these 2 emergency

1334  absences after 20 years' of never taking a day's leave from College service. Plaintiff suffered a

1335  **temporal disability** causally related to unmediated conduct activity that was under the job-

1336    described purview of Defendant Wentworth in his capacity as "Student Life Manager for Student

1337    Conduct and Academic Integrity."

1338    **4/21** Plaintiff alerts Defendant Salam, Defendant Wentworth (and specific other upper-level

1339    functionary Defendants) that in **April** alone, "Student" has missed attending class **4/12, 4/17, 4/19,**

1340    **not including the first 3 classes,** in substantial excess of NYS mandated Attendance requirements.

1341    **4/23** Plaintiff emails Defendants and non-Defendants  in OHR (under Defendant Diaz, labor

1342    designee), SOCSCI, OSA requesting an update from OSA on "Student" who has not returned to

1343    Class or completed any assignments. She has unofficially withdrawn (WU) since **3/27** Midterm

1344    Exam.

1345    **5/7** Defendant Salam email for the first time describes "Student" conduct (that she knows is under

1346    OSA purview and decision making), as a "classroom management" issue of Plaintiff. Defendant

1347    Salam patently asserts falsely. If it were a classroom management issue, decided by any Faculty,

1348    why is there a BART? And why is there no issue regarding any other students in my classes?

1349    "Student" conduct is unequivocally within OSA's BART purview.   BART has job titles

1350    specifically related to Student **conduct.  Defendant Wentworth explicitly self-stated job title in**

1351    **emails to me state him to bear the OSA job title "Student Life Manager for Student Conduct**

1352    **and Academic Integrity".**   NO faculty bears such a title! BART personnel get paid to, hopefully

1353    help students manage their conduct so they become successful learners. Adjunct Faculty are

1354    charged to deliver an exciting interactive, data-driven (for Pathways Science) Syllabus of their

1355    making as per The Adjunct Faculty Handbook, with Department oversight.   OSA are charged to

1356    **manage <u>all</u> Students' conduct** with rules of their making presumably with the oversight of Office

1357    of Student Affairs (OSA)

1358    In this specific context of student conduct v. Faculty Syllabus-delivery responsibility that Plaintiff

1359    presents below a remarkable parallel to Plaintiff Karunakaran's experience as per the First Cause

1360    of Action in her Amended Complaint:

1361    Plaintiff presents these remarkable parallels, brought by a faculty comparator against my own

1362    Department just 2 years before my "non-reappointment,"

1363    Trujillo v. BMCC CUNY 1:15-cv-10582   2016

1364     Spring 2016 in a case that Plaintiff, whom 1-2 students targeted as White, but self-ascribed as

1365    Latino, alleged racial discrimination in employment against Defendant Bishop and Defendant

1366    Perez. That Plaintiff's employment was terminated, after he called Security to remove a Student

1367    from his class.

1368    *His* student earlier, "called him a d…..k" in front of his entire class.

1369    *My* student said "You suck.  You don't know anything." accompanied by a hateful, coldly hostile

1370    demeanor."

1371    That Plaintiff was escorted out of his class by BMCC Security, as directed to do so, by the College,

1372    BMCC, sometime after he had called "Security" on a Student.

1373    My parallel observation, from this distance in time, upon learning of this case is that if I had called

1374    Security on a student conduct issue under OSA purview, I would almost certainly have been

1375    escorted out of my class by Security, as happened to my faculty comparator whose protected

1376    characteristics were different than my own.  He brought his own lawsuit in 2016 when that faculty

1377    comparator was teaching during the same period that Plaintiff Karunakaran was teaching.

1378    Both Faculty Plaintiffs were terminated in different academic years, just 2 years apart! After they

1379    cited concerns about student conduct, in acts of retaliation causally related to Student conduct

1380    while BART was and still is, in charge of Student Conduct and in addition "Academic Integrity."

1381    At that sane time and in all relevant times including the period Spring semester 2018 BART was

1382    in operation.    BART was established in 2012.

1383    5/11 Defendant Perez issues to Plaintiff, Letter stating "non-reappointment" of Plaintiff.

1384

1385    **Plaintiff's Notes on her Comparators**

1386            Plaintiff's proximate and ultimate comparators are ALL faculty, we teach the same

1387    students, though many thousands are paid less per course; we teach syllabi reviewed by

1388    Departmental Chairs; we have membership in respective  Departments, whether we teach Physics

1389    or Business or Social Sciences; we submit semester grades to the same Registrar and we are

1390    required to submit concerns about Student conduct, since 2012, to the BART mechanism  under

1391    Defendant Wentworth within the Office of Student Affairs.

1392            It is practically impossible to adjudge, but not practically impossible to adduce that Faculty

1393    Plaintiff was objectively treated less well or less fairly than similarly situated faculty. However,

1394    Plaintiff has 1 direct evidence record from personal experience of 1 such disparate impact when

1395    she was informally approached by a full-time faculty, a comparator in Psychology, Plaintiff's

1396    discipline, to cover her evening classes on another CUNY campus, as this colleague, acquaintance

1397    and comparator needed to undergo surgery. She sent Plaintiff an email about her classes which

1398    were 2 double classes for each of her 2 courses on one evening at an uptown CUNY campus

1399    college.

1400    Plaintiff was excited to cover her comparator's classes because it is always interesting to see if I,

1401    Plaintiff, can better my own practice by interacting with other students on a different syllabus

1402    within the same Discipline, Psychology.

1403    This faculty comparator told me I could "let them go after 1 hour."  for each set of students!

1404        Plaintiff replied that she could not do that and would deliver comparator's syllabus, for the

1405    entire duration of each time segment. not merely 1 hour.  I also disappointed my comparator's

1406    students who protested to me 'my teacher allows us to go after 1 hour." of a 2 hour and 30-minute

1407    course, for each set of students.

1408    Plaintiff conveyed this instance to Defendant Bishop without naming my comparator who did not

1409    belong to my race, ethnicity national origin or age,   This instance of disparate impact becomes

1410    part of my allegation of my pretextual termination based on the fact that I  taught 4 classes online

1411    out of 32 classes and took 2 days' as a result of serial conduct acts, in my classroom and my shared

1412    office by 1 "Student", and that "Student"'s serial conduct was serially unmediated by **Defended**

1413    **Wentworth** in his job-described service capacity as "**Student Life Manager for Student**

1414    **Conduct and Academic Integrity"**

1415        I reported this experience to my Department Chair, Defendant Bishop, while I was being

1416    emailed repeatedly and punitively for teaching 4 out of 32 classes online during a highly disruptive

1417    extended enrollment (Enrollment is NOT Attendance! Defendant Perez, President obfuscated this

1418    distinction, possibly for accreditation period that in Spring 2018 (coincided with and was

1419    orchestrated through intense Middle States accreditation efforts by the President, Defendant).

1420    Case in point is the VoE/CoA process that affected all comparators' Syllabus delivery. However,

1421    it appears to be in violation of mandated attendance requirements of NYS. In this process in Spring

1422    2018 we faculty comparators were required to verify attendance through VoE if any student

1423    attended just ONCE! The second checking period indicated was from 2/20 to 3/2, 4 weeks after

1424    classes began!

1425        In yet another comparator instance in a prior semester, of being treated less fairly the Chair

1426    directed/advised a student to seek an independent study under my supervision. In a truly collegial

1427   environment, I would have loved to meet this student's academic need and would enjoyed reading

1428   and meeting her on her research. Such a collegial environment is not promoted at BMCC, The

1429   Chair did not directly approach me.  She had the student approach me.  The student explicitly

1430   informed me the Chair had so directed her.  The Defendant Rifat Salam, her Deputy, was then put

1431   in charge of damage control! I am reasonably certain that I was treated differently than my adjunct

1432   faculty comparators, and my fulltime comparators, the preponderant majority of whom do not have

1433   membership within my protected characteristics.

1434   Despite structural inequities in employment Plaintiff's comparators are dedicated to seeing their

1435   students succeed.  We share common goals to help students. The real issue is whether faculty, no

1436   matter their protected characteristics, can rely on behavioral guidance for students from the

1437   administration.  Or will admin, lack the competence and the will to deliver student support services

1438   at the same time as the Professor is delivering the Syllabus to all students without a discriminatory

1439   practice that **causally** produces a wholly preventable discriminatory employment outcome based

1440   on race, age, retaliation, contract breach.

1441   [1] CUNY own EO and ND policies were violated both specifically and generally. My

1442   employment was terminated while CDO was still setting up interviews with me! A complaint form

1443   is mentioned, but to my best recollection was never made available to me.  If there was a report, I

1444   never saw it.

1445   The non-reappointment was **pretextual,**  as my wide-ranging whistleblower activity across

1446   departments and functionaries, in particular my sustained engagement with BART on

1447   discriminatory negligence in the matter of conduct management issues impacting "Student".

1448   Plaintiff resisted disruption of her Syllabus delivery of a Pathways Psychological Science STEM

1449  course while at the same time actively seeking cooperation from BMCC, for a Student who like

1450  all students had the potential to succeed.

1451  Defendant Perez' retaliatory, discriminatory, non-reappointment action is the focus of my

1452  Amended Complain presented herein.

Respectfully submitted,

Signed: /s/Chitra Karunakaran

(Dr. Chitra Karunakaran Ed.D.)                                      Date April 30, 2021

=======================================================================